IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

RICHARD L. MCCLELLAN                                                                                           PLAINTIFF

v.                                            Case No. 3:11-CV-03022

UNUM LIFE INSURANCE COMPANY OF AMERICA                                            DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Plaintiff Richard L. McClellan brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging Defendant Unum Life Insurance Company of America wrongly denied his claim for long term disability benefits. Before the Court are the Administrative Record (Doc. 9), Plaintiff's Brief (Doc. 11), which is incorrectly styled "Motion for Summary Judgment"[1], and Defendant's Brief (Doc. 14). For the reasons stated herein, the Court finds that Defendant's decision to deny benefits is AFFIRMED, Plaintiff's claim is DENIED, and this case is DISMISSED with prejudice.

**I. Background**

Plaintiff, who holds a Bachelor of Science degree in electronics, was employed by Archer Daniels Midland Company in Illinois as a process control engineer, responsible for programming devices that controlled other manufacturing equipment. (Doc. 9-7, p. 29). The job Plaintiff performed for his employer for approximately 10 years was a sedentary one limited to keyboarding

---

[1] Plaintiff submitted a second ERISA Brief to the Court, also incorrectly styled "Motion for Summary Judgment" on July 25, 2011 (Doc. 12) along with a Statement of Facts in Support (Doc. 13). Plaintiff never sought leave to file this additional brief or other documents, and such filing was made after the deadline of July 22, 2011, which was imposed by the Court's June 21, 2011 Order granting Plaintiff's Motion for Extension of Time. As Plaintiff's second Brief (Doc. 12) and Statement of Facts (Doc. 13) were filed too late and without leave of Court, they were not considered by the Court.

and telephone work. *Id.* The job could be performed with alternating standing and sitting, and primarily involved using a computer. *Id.* at p. 30.

On November 26, 2007, Plaintiff was involved in a one-vehicle auto accident in Illinois in which he drove through a ditch. (Doc. 9-37, p. 28). After the accident, Plaintiff began experiencing lower back pain. His family physician, Dr. Kureishy, examined Plaintiff the day after the accident, took X-rays, and finding nothing wrong, sent Plaintiff home with pain medication only. (Doc. 9-34, p. 11). The following week, Plaintiff underwent a CT scan, where a compression fracture of unknown age and possible herniated discs were diagnosed. Within two weeks of the accident, Plaintiff was back at work full time. However, six months later, by June of 2008, Plaintiff claimed that back pain caused by the car accident ended his ability to work.[2] Plaintiff received short term disability benefits from June 2, 2008 until November 30, 2008. He began receiving long term disability benefits on December 1, 2008, but these were terminated by Defendant on March 18, 2010.

**A. Plaintiff's Doctors**

Plaintiff's family doctor, Dr. Kureishy, referred Plaintiff to a neurologist, Dr. Mahmood, who on June 9, 2008 evaluated Plaintiff's complaints of numbness and radiation of pain from his lower back to his left leg. Dr. Mahmood found no neurological basis for Plaintiff's claimed symptoms after performing a nerve conduction study. (Doc. 9-5, pp. 12-13).

Thereafter, Dr. Kureishy referred Plaintiff to neurosurgeon Dr. Chu, who ordered a CT scan and MRI of Plaintiff's lumbar spine on July 10, 2008 and identified an old compression fracture of

---

[2] The administrative record contains no documentation of Plaintiff receiving any medical treatment from the approximate date of the car accident until Plaintiff began taking short term disability leave six months later.

2

one of Plaintiff's lumbar vertebrae, with no evidence of disc herniation or encroachment of the bony elements on the central spinal canal. *Id.* at pp. 10-11. On August 25, 2008, Plaintiff was referred to Dr. Furry, a pain management specialist, who reported that Plaintiff experienced discogenic pain due to the old compression fracture. (Doc. 9-6, pp. 28-30). Though on September 5, 2008 Dr. Chu cleared Plaintiff to go back to work (*id.* at p. 13), a pain management specialist named Dr. Fancher recommended performing a surgical procedure on Plaintiff to address his continuing complaints of lower back pain. (Doc. 9-9, p. 10-12). Dr. Fancher performed an operation called a kyphoplasty on September 12, 2008 to elevate and stabilize the old compression fracture that had been identified in Plaintiff's low back. *Id.* Plaintiff then received epidural steroid injections on September 18, 2008 and October 2, 2008. (Doc. 9-11, pp. 6 and 8).

On November 3, 2008, Dr. Furry submitted a statement to Defendant concluding that Plaintiff had no restrictions and limitations, had a good return to work prognosis, and had no barriers to return to work. (Doc. 9-17, pp. 27-28). However, on November 4, 2008, Plaintiff's family physician, Dr. Kureishy, submitted a conflicting report to Defendant stating that Plaintiff had a poor prognosis for returning to work, either on a part-time or a full-time basis, due to severe back pain. (Doc. 9-12, pp. 2-3).

On December 10, 2008, Plaintiff moved to Arkansas to be closer to family. (Doc. 9-16, p. 17). On December 16, 2008, Dr. Fancher, who performed Plaintiff's kyphoplasty, declined to give any opinion regarding restrictions and limitations on Plaintiff's return to work, instead recommending that Plaintiff be evaluated by another physician. *Id.* at pp. 28-29. Plaintiff thereafter saw Dr. Robinson, a physician in Mountain Home, Arkansas. *Id.* at p. 17. On February 17, 2009, Dr. Robinson reported to Defendant that Plaintiff suffered chronic back pain, but Dr. Robinson did

3

not recommend any restrictions or limitations on Plaintiff's ability to work, nor did the doctor state his opinion on when Plaintiff could return to work. (Doc. 9-18, p. 23). When asked directly about certifying Plaintiff's continuing disability, Dr. Robinson refused to perform this determination. *Id.* In the meantime, Plaintiff applied for Social Security disability benefits, but was denied. (Doc. 9-20, p. 1).

On September 9, 2009, Defendant informed Plaintiff by letter that it required confirmation from a treating physician that Plaintiff had a continuing disability, otherwise Defendant would make a benefits determination based on the information it had at the time. (Doc. 9-22, pp. 26-27). On October 7, 2009, Dr. Vann Smith, a neuropsychologist, reported to Defendant that he had examined Plaintiff and concluded that Plaintiff had an organic brain dysfunction of moderate severity and progressive velocity as a result of dealing with chronic pain. (Doc. 9-23, p. 4). It was Dr. Smith's view that Plaintiff suffered from cognitive problems of such severity that he could not return to work. *Id.*

Several months later, another neuropsychologist named Dr. Back examined Plaintiff on April 26, 2010, and concluded that Plaintiff had extremely poor balance, constant back pain, and depression. (Doc. 9-37, pp. 2-29). Dr. Back administered intelligence tests to Plaintiff, which showed that his IQ was in the "dull normal range." (Doc. 9-38, p. 2). Dr. Back found that Plaintiff's IQ had significantly decreased since the time Dr. Smith had evaluated it (from an IQ of 105 to an IQ of 75). Dr. Back opined: "For his IQ to have dropped. . . is very significant, and would mean a rapidly progressing cortical disorder." *Id.* at p. 4. However, this diagnosis was not supported, and Dr. Back did not endorse it. Instead, Dr. Back suggested that Plaintiff was exaggerating or feigning a cognitive disorder: "His history does not indicate the presence for any

4

such condition. His non-existent memory is also felt to be due to psychological factors." *Id.*

### B. Defendant's Doctors

On December 29, 2009, on behalf of Defendant, a physician named Dr. Frigon conducted a review of all the medical information in Plaintiff's file. Dr. Frigon opined that the work restrictions recommended by Dr. Kureishy were not supported. (Doc. 9-27, p. 22). Dr. Frigon also concluded that there were no physical examinations or test findings in the file to indicate that Plaintiff lacked the physical capacity to perform full-time work. *Id.* In fact, the most recent diagnostic testing indicated that Plaintiff's old compression fracture in his lumbar region had been properly treated via kyphoplasty, and there was no organic explanation for his ongoing complaints of low back pain. *Id.* Dr. Frigon concluded that two years after the car accident that allegedly caused Plaintiff's injuries there is no clear cause for Plaintiff's ongoing pain complaints that would preclude him going back to work. *Id.*

Dr. Council, Defendant's designated medical officer, also reviewed Plaintiff's medical file and found that the records did not indicate impairment that was sufficient to preclude work. *Id.* at p. 28. She elaborated: "MRI scans and CT scans reveal no involvement of neural structures and EMG was normal of both lower extremities. . . Compression fractures generally heal within 12 weeks and can be very painful initially with lessening of pain with healing. File does not contain any significant medical information between initial radiographic study and stopping work. It is unclear why pain worsened to a point to prevent work 6-7 months after the [car accident]." *Id.*

Defendant also hired a neuropsychologist, Dr. McLaren, to evaluate the findings of Plaintiff's neuropsychologist, Dr. Smith. *Id.* at pp. 6-11. Dr. McLaren concluded that Dr. Smith's cognitive evaluation of Plaintiff was deficient in that it lacked a comprehensive assessment as to emotional

5

status or memory. *Id.* Furthermore, Dr. McLaren criticized Dr. Smith's pattern of testing and disagreed with Dr. Smith's diagnosis of dramatic cognitive defects. *Id.*

Following Dr. McLaren's review, Defendant hired a second neuropsychologist, Dr. Denney, to provide a second opinion. Dr. Denney administered tests to Plaintiff to determine his mental status and also to determine whether Plaintiff gave maximum and accurate effort on the tests. (Doc. 9-34, pp. 9-10). He concluded that Plaintiff's performance fell at the lower end of the random range

> "and created a profile that, if a valid reflection of his true cognitive ability, would be worse than that demonstrated by individuals who are severely demented and living in convalescent homes. His performance was worse than patients asked to fake impairment. This performance was also well below that of the chronic pain normative samples. . . performing worse than chronic pain patients, moderate to severe brain injury patients, and patients with severe dementia . . . These findings clearly indicate that he did not put forth appropriate effort during neuropsychological testing. Consequently, the following test results are not a valid indication of his true cognitive abilities."

*Id.* at pp. 18-19.

Dr. Denney concluded that his all-day testing of Plaintiff suggested "gross over-exaggeration of self-reported complaints." *Id.* at p. 20. Dr. Denney also stated, "I am unable to determine his genuine strengths and weaknesses because he was either feigning or grossly over-exaggerating neurocognitive deficits." *Id.* at p. 22.

Defendant next hired Dr. Zimmerman, a licensed psychologist, to evaluate Dr. Back's report. Dr. Zimmerman concluded that "there was no test evidence that contradicted Dr. Denney's

diagnostic impression of Malingered Neurocognitive Dysfunction[3]." (Doc. 9-38, p. 14). Plaintiff's medical file was then reviewed by Dr. McPhee, another physician hired by Defendant. Dr. McPhee affirmed that ". . . [t]he claimant's self described functional impairments are inconsistent with his observed activities and are not validated by the clinical or diagnostic finding." (Doc. 9-39, p. 2).

### C. Surveillance Evidence

In February of 2010, Defendant conducted surveillance of Plaintiff and documented footage of him driving, going to the bank, shopping at Wal-Mart, making multiple trips to and from residences, carrying sticks, bending, squatting, hammering, and walking without a cane or other medical device. (Docs. 9-31 and 9-32).

## II. Standard of Review

Generally, once a plaintiff has exhausted his administrative remedies, the court's function is to conduct a review of the record that was before the administrator of the plan when the claim was denied. *See Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A denial of benefits claim under ERISA is reviewed for an abuse of discretion when "a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations." *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 1997)(en banc)(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). If a plan confers discretionary authority, then the Court must defer to the determination made by the administrator or fiduciary unless such determination is

---

[3] After eight hours of testing, Dr. Denney had determined that Plaintiff's alleged neurocognitive dysfunction was "malingered." The medical definition of "malingering" is: "feigning illness or disability to escape work, excite sympathy, or gain compensation." Stedman's Medical Dictionary 1147 (28th ed. 2006).

arbitrary and capricious. *Firestone*, 489 U.S. 115. "[R]eview for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference" because the terms are generally interchangeable. *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008), citing *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 946 n.4 (8th Cir. 2000).

Abuse of discretion is the proper standard of review in this case, as the benefits plan administered by Plaintiff's employer, Archer Daniels Midland Company, delegated to Defendant the discretionary authority to make eligibility determinations. (Doc. 9-4, p. 26). The decision of the administrator may only be overturned if it was not "reasonable, i.e., supported by substantial evidence." *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996). The administrator's decision will be deemed reasonable if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Id.* If the decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, (8th Cir. 1997), citing *Donaho*, 74 F.3d at 899.

The Court will examine the basis behind the administrator's decision in order to determine if it is supported by substantial evidence. The evidence should be assessed by its quantity and quality, and this review, "though deferential, is not tantamount to rubber-stamping the result." *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).

There are five factors the Court will analyze in order to determine whether an administrator's decision was reasonable:

(1) whether the administrator's interpretation is consistent with the goals of the Plan;

(2) whether the interpretation renders any language in the Plan meaningless or

>internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Id.* (citing *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002)).

In addition to analyzing these five factors, the Court will also consider that a conflict of interest may exist in this case, as Defendant both determines whether an enrollee is eligible for benefits and also pays the benefits out of its own pocket. Plaintiff contends the conflict of interest should be considered as a factor in determining whether there was an abuse of discretion. The Supreme Court has stated that a reviewing court is to give importance to this conflict of interest depending upon how closely the other factors are balanced. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2351 (2008). Accordingly, the Court will review the denial of benefits for an abuse of discretion, taking into account relevant factors to include the potential conflict of interest.

**III. Discussion**

In determining whether Defendant's denial of benefits was reasonable and supported by substantial evidence, the Court reviews the quantity and quality of the medical evidence provided in the administrative record, as well as the relevant provisions of the benefit plan ("Plan").

An employee with a "disability" is defined by the Plan as: ". . . limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and . . . a 20% or more loss in your indexed monthly earnings due to the same sickness or injury." (Doc. 9-4, p. 2). The term "material and substantial duties" means "duties that are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." *Id.* at p.

17. The term "regular occupation" refers to "the occupation you are routinely performing when your disability begins." *Id.* at p. 18.

Under the Eighth Circuit's holding in *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002), the first factor the Court must consider in evaluating the reasonability of a Plan administrator's denial of ERISA benefits is whether the administrator's interpretation is consistent with the goals of the Plan. The Plan's goal or intent is to "provide coverage for a payable claim which occurs while . . . covered under the policy or plan." (Doc. 9-3, p. 30). A payable claim is one for which Defendant is liable under the terms of the policy, which is triggered by a finding of disability. As discussed above, a "disability" is a condition that limits the employee from performing "the material and substantial duties of [his] regular occupation." (Doc. 9-4, p. 2).

Here, the administrator's decision to deny Plaintiff benefits was entirely consistent with the goals of the Plan. Considering the medical data present in the administrative record, including reports from doctors who directly treated Plaintiff and those who reviewed the paper file, the sole support for Plaintiff's claims of incapacitating back pain comes from Plaintiff's family practice physician, Dr. Kureishy. Dr. Kureishy's directive that Plaintiff discontinue full-time work stands alone among the many other doctors' recommendations, including Plaintiff's own doctors' recommendations, that Plaintiff is fully capable of returning to his former job. The law is clear that insurance companies are not required to give more weight to the opinions of doctors who treat the patient, as opposed to those who merely review the patient's file. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

The medical tests in Plaintiff's file revealed an old compression fracture and a disc bulge, but with no neural or nerve root compromise to explain Plaintiff's complaints of pain. Plaintiff's

10

own doctors, Doctors Chu and Mahmood, examined Plaintiff and found no objective medical evidence supporting Plaintiff's claim of disability. Both Dr. Chu and another of Plaintiff's doctors, Dr. Furry, a pain specialist, cleared Plaintiff to return to work with no restrictions or limitations. Five doctors hired by Defendant also failed to find any organic reason for Plaintiff's pain and all recommended that Plaintiff resume full-time work.

      As for Plaintiff's complaints of neuropsychological deficits, including memory problems and other cognitive disorders, the Court finds that Defendant's doctors demonstrated that Plaintiff's claims in this area were not genuine. Drs. Denney, McLaren, and Zimmerman concurred that Plaintiff's cognitive deficits were feigned. Indeed, it stretches the imagination to believe that Plaintiff, an engineer with a college degree, suffers from such severe back pain (with no organic cause) that his IQ has dropped to 75, which is lower than the average IQ score of a person with a severe brain injury or dementia.

      The second factor in assessing the reasonableness of Defendant's decision is whether the interpretation renders any language in the Plan meaningless or internally inconsistent. *Shelton*, 285 F.3d at 643. Since the medical evidence overwhelmingly supports a determination that Plaintiff is not disabled, Defendant's decision is reasonable and a proper interpretation of the Plan's terms. Plaintiff's former job was sedentary, involving seated work at a computer or on the telephone. Sitting and standing, alternating, were acceptable work behaviors. There is substantial evidence in the record that Plaintiff would be able to perform these work tasks and be successful in this work environment.

      In examining the remaining three of the five factors announced in *Shelton*, this Court must assess the following in determining whether an abuse of discretion occurred: (1) whether the

11

administrator's decision to deny benefits conflicts with the substantive or procedural requirements of the ERISA statute; (2) whether the administrator has interpreted the words at issue consistently; and (3) whether the administrator's interpretation is contrary to the clear language of the Plan. The Court finds that Defendant has acted carefully, reasonably, and appropriately in evaluating Plaintiff's claim in light of the Plan's terms and that the remaining three *Shelton* factors are satisfied. Moreover, Defendant's decision was supported by substantial evidence. The video surveillance conducted by Defendant's agent showed Plaintiff engaging in a number of activities without noticeable restrictions. Relying on such video surveillance "provides another form of objective evidence upon which an ERISA plan administrator may base its claims determinations." *Green v. Union Sec. Ins. Co.*, 2011 U.S. App. LEXIS 14994 (8th Cir. July 22, 2011).

Finally, there is no evidence in the record to indicate that a conflict of interest influenced Defendant's decision. The decision was supported not only by Defendant's medical consultants but by Plaintiff's own treating physicians. Accordingly, the conflict of interest factor is not significant in the Court's abuse of discretion review. The Court finds that Defendant did not abuse its discretion in denying Plaintiff's claim and that Defendant's decision was supported by substantial evidence on the record.

### IV. Conclusion

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's decision to deny benefits is AFFIRMED, Plaintiff's claim is DENIED, and this case is DISMISSED with prejudice. An order of judgment shall be filed contemporaneously herewith, with all parties instructed to bear

their own fees and costs.

      IT IS SO ORDERED this 24th day of January, 2012.

                                    /s/ P. K. Holmes, III
                                    P.K. HOLMES, III
                                    UNITED STATES DISTRICT JUDGE